NL INDUSTRIES, INC.; AND THE 25 CORPORATION, INC., Appellants, v. EISENMAN CHEMICAL COMPANY; AND MARVEL-JENKINS RANCHES, A Copartnership Composed of LOUISE M. MARVEL, THE ESTATE OF ERNEST R. MARVEL, RICHARD T. MARVEL, MARY (aka MARY O.) MARVEL, THOMAS J. MARVEL, ROSITA (aka ROSITA P.) MARVEL, JOHN W. MARVEL and WILBURTA MARVEL, Respondents.

No. 13646

June 3, 1982

645 P.2d 976

[Rehearing denied August 17, 1982]

*Hill, Cassas, deLipkau & Erwin,* Reno; *Marshall, Bratter, Greene, Allison & Tucker,* and *Richard L. Bond,* New York, New York, for Appellant NL Industries, Inc.

*C. E. Horton,* Ely; *Davis, Graham & Stubbs* and *Neil Peck,* Denver, Colorado, for Appellant The 25 Corporation, Inc.

*Hoy & Miller, Chartered,* Elko; *Van Cott, Bagley, Cornwall & McCarthy* and *E. Scott Savage,* Salt Lake City, Utah, for Respondent Eisenman Chemical Company.

*John E. Marvel,* Elko; *F. Alan Fletcher,* Salt Lake City, Utah, for Respondent Marvel-Jenkins Ranches.

*Smith & Gamble,* Carson City; *Evans, Kitchel & Jenckes,* Phoenix, Arizona, for Amici Curiae Phelps Dodge Corp.; ASARCO, Inc.; Sunshine Mining Co.; Milchem, Inc.; Noranda Exploration, Inc.; and Genstar Cement and Lime Co.

*Durney, Guinan & Brennan,* Reno, for Amicus Curiae Dresser Industries, Inc.

*Vargas & Bartlett,* and *Robert W. Marshall,* Reno, for Amicus Curiae Duval Corp.

*Ross P. Eardley,* Elko, for Amici Curiae Bullion Monarch Company, and Metals Incorporated.

*Charles M. McGee,* Reno, for Amicus Curiae Western Gas, Oil & Mining, Ltd.

# OPINION

By the Court, MANOUKIAN, J.:

Appellants NL Industries and The 25 Corporation,[1] appeal from a district court order granting respondent Eisenman Chemical Company exclusive and immediate occupancy of a portion of disputed mining property near Carlin, Nevada. The order grants respondent Eisenman the right to extract and sell barite ore from the property and to use its surface areas to complete extraction from a nearly exhausted claim. The district court issued the order pursuant to NRS 37.100, which provides for immediate occupancy pending judgment in a condemnation proceeding if the equities favor the plaintiff and if the relative damages which may accrue indicate a need for immediate relief.

Appellants contend that the order was improper in this case. They allege, *inter alia,* that because the disputed property was already appropriated for mining use and Eisenman's proposed action would destroy that use, condemnation of mineral deposits was impermissible and therefore, immediate occupancy was improperly granted. Under the circumstances revealed by the record now before us, we agree with appellants' contention.

NL and Eisenman are competitors in the barite mining industry. Since 1973, Eisenman has actively mined and processed barite from property known as the Lakes No. 1 unpatented lode mining claim (hereinafter "Claim").

Since 1964, The 25 Corporation, through predecessors in interest, has owned the fee interest in the surface estate of a large cattle ranch in northeastern Nevada. The mineral rights to The 25 Corporation's ranch are shared between The 25 Corporation and respondent Marvel-Jenkins, each owning a 50 percent undivided interest. The 25 Corporation has the exclusive right to lease the mineral rights and did so lease eight sections of land known as the Lakes Property (hereinafter "Property") in October 1980 to NL. NL had held contractual rights to prospect for minerals on the ranch since 1979. The Property includes and surrounds the smaller Claim area. The NL lease will terminate in 10 years if no minerals from the Property have been put into commercial production by that time. The Marvel-Jenkins 50 percent interest is subject to

---

[1] Marvel-Jenkins Ranches, a co-partnership and owner of an undivided 50 percent interest in the mineral rights on the disputed property, originally joined this action as a co-appellant. Marvel-Jenkins has since withdrawn its appeal, having settled with Eisenman and adopted the position of co-respondent.

defeasance (reverting to The 25 Corporation) if minerals are not produced by mid-1984.

In its complaint, Eisenman alleges that under theories of reformation, equitable estoppel and adverse possession, it owns a 75 percent undivided mineral interest in the Claim, including extralateral and appurtenant rights, and seeks to condemn the remaining 25 percent.[2] Alternatively, Eisenman seeks to condemn *all* of appellants' interest in the Claim (including extralateral/appurtenant rights) if it is determined that Eisenman does not .otherwise own a 75 percent interest. Eisenman also alleges that the lease between NL and The 25 Corporation should be abrogated, because the two corporations were engaged in a conspiracy to deprive Eisenman of the lease and the Marvel-Jenkins group of their 50 percent interest in the Property's mineral rights. The only part of the complaint relevant to this appeal concerns Eisenman's alleged right to condemn the mineral interest in the Property. Without a right to condemn, there can be no right to immediate occupancy. Shaklee v. District Court, 636 P.2d 715 (Colo. 1981).

The Property contains an estimated eight million tons of barite ore, worth approximately $40,000,000. The immediate occupancy order grants Eisenman the right to extract approximately 190,000 tons of ore on the Property outside the Claim. The order also grants Eisenman exclusive access to surface areas on the Property to conduct ancillary mining activities to extract the ore that remains within the Claim's vertical boundaries.

Based on testimony and other evidence presented at the hearing on the immediate occupancy order below, the district court made two findings pertinent to this appeal: (1) that appellant NL had no plans to mine the Property immediately, but was holding the barite in reserve for up to ten years (the initial lease period); and (2) that respondent Eisenman had a comprehensive mining plan calling for immediate extraction of the disputed ore.

The district court based its decision to grant the order permitting immediate occupancy on its conclusion that "the holding of mineral reserves is a mining use, but the development

---

[2]Eisenman's complaint included causes of action alleging that Eisenman owns a 75 percent interest in the Claim through record chain of title. In an order granting partial summary judgment, the. district court appears to have resolved these causes of action in favor of appellants.

and mining of mineral rights or a mineral deposit is a more necessary public use."[3]

We agree that the holding of mineral reserves is a mining use, but we reject the lower court's determination that immediate extraction and production of mineral resources is a more necessary public use than holding ore in reserve for future mining. It is beyond question that Eisenman's proposed use, extraction of barite ore, will entirely destroy NL's intended use, namely, to maintain a reserve of barite for future production. Nevada's eminent domain statutes do not authorize condemnation of property for mining purposes when such property is already devoted to a legitimate mining purpose and the condemnor's proposed activities would extinguish or seriously interfere with the condemnee's mining use.

[Headnote 5]

It is well established in this state that mining, being of paramount interest, is a public use and that the power of eminent domain can be exercised on behalf of that industry. NRS 37.010(6).[4] See also, State ex rel. Standard Slag Co. v. District Court, 62 Nev. 113, 143 P.2d 467 (1943); Goldfield Consolidated Milling & Transportation Co. v. Old Sandstorm Annex Gold Mining Co., 38 Nev. 426, 150 P. 313 (1915); Dayton Gold

---

[3]NRS 37.030(3) provides that property already appropriated to a public use may be condemned "but such property shall not be taken unless for a more necessary public use than that to which it has been already appropriated."

[4]NRS 37.010 enumerates the public uses for which the right of eminent domain may be exercised, including:

6. Mining, smelting and related activities. Mining, smelting and related activities as follows:

(a) Mining and related activities, which are recognized as the paramount interest of this state.

(b) Roads, railroads, tramways, tunnels, ditches, flumes, pipes and dumping places to facilitate the milling, smelting or other reduction of ores, or the working of mines, and for all mining purposes; outlets, natural or otherwise, for the deposit or conduct of tailings, refuse, or water from mills, smelters, or other work for the reduction of ores from mines, mill dams, natural gas or oil pipe lines, tanks or reservoirs; also an occupancy in common by the owners or possesors of different mines, mills, smelters or other places for the reduction of ores, or any place for the flow, deposit or conduct of tailings or refuse matter; also necessary land upon which to erect smelters and to operate the same successfully, including deposition of fine flue dust, fumes and smoke.

& Silver Mining Co. v. Seawell, 11 Nev. 394 (1876). The circumstances of this case, however, create an issue of first impression for this court. Despite respondent's contentions to the contrary, in no case has the right to condemn mineral deposits been at issue. In the Nevada cases noted above, this court was concerned only with the right to condemn property to conduct ancillary mining purposes for development of the condemnor's existing mine. And we are aware of no case from any other jurisdiction which directly addresses the issue confronting us in this appeal.

We find nothing in Nevada statutes or prior case law that would absolutely preclude condemnation of property for the purpose of extracting the mineral deposits contained therein. *See* Milchem, Inc. v. District Court, 84 Nev. 541, 445 P.2d 148 (1968). Nor do we find that appellants seriously question this general authority to condemn mineral deposits; they claim, instead, that Chapter 37 does not authorize one mining company to condemn another mining company's ore. That argument improperly focuses on the label attached to the condemnee and condemnor. The essential determinant is the *purpose* which the condemnee and condemnor intend for the property. It is conceivable that a mining company might purchase and hold land for a non-mining, non-public purpose. Under such circumstances, we see no justification for exempting property from condemnation simply because the owner is a mining entity. Ultimately, when the allegations of Eisenman's complaint are fully litigated at trial, perhaps proof will be adduced that NL is not, in fact, holding the property in question for the purpose of mining. However, the district court found, on the basis of the record as presently developed, that NL's use of the property was mining-related and therefore, a public use. The "prior public use doctrine" is well recognized in the law of eminent domain:

> [P]roperty of a private corporation devoted to a public use, although not clothed with a specific exemption from subsequent condemnation, cannot be taken to be used in the same manner for the same purpose by a different corporation, even by express enactment of the legislature.

1 J. Sackman, Nichols' Law of Eminent Domain, § 2.2[9], n. 3 (rev. 3d ed. 1981). *See also,* Utah Copper Co. v. Stephen Hayes Estate, Inc., 31 P.2d 624 (Utah 1934), *cert. denied* 295 U.S. 742 (1935).

NRS 37.030(3) permits condemnation of property already appropriated for public use if a more necessary public use is contemplated by the condemnor. That statute, however, cannot support condemnation when the condemnee's actual or contemplated use is the same as that proposed by the condemnor, and the proposed use will defeat or seriously interfere with the condemnee's use. *See Standard Slag, supra;* Marsh Mining Co. v. Inland Empire Mining & Milling Co., 165 P. 1128 (Idaho 1916); State ex rel. Butte-Los Angeles Mining Co. v. District Court, 60 P.2d 380 (Mont. 1936).

Respondents place particular reliance on our decision in *Goldfield, supra,* in which we stated that "[t]he mere possibility that the land may some time in the future be used by [the condemnee] for mining purposes will not prevent condemnation." *Id.* at 446, 150 P. at 319. In the instant case, however, the record does not show that NL's mining use is a "mere possibility." The condemnee in *Goldfield* had ceased using the subject property for mining purposes for some time. Here, NL had leased the property a mere five days before Eisenman commenced this litigation. The record would not support a finding of abandonment of mining purpose, nor, of course, did the district court make such a finding.[5]

We are also impressed by the public policy considerations which militate against the district court decision. The record in this case, as well as the briefs of several amici curiae, support appellants' position that mineral reserves are as important to the welfare of the mining industry as actual production of ore, particularly for companies that produce industrial minerals such as barite, which is primarily used to facilitate oil and gas exploration. Development of barite mining property consumes considerable time and expense. In order to maintain a continuous and reliable supply of barite of reasonable quality, substantial reserves are necessary. Were we to adopt the district

[5]Respondents contend that NL does not intend to mine the property, that it leased the property merely to withhold barite from competitors and/or to circumvent the Marvel-Jenkins interest in the mineral rights. The district court's findings do not support these contentions. Those findings accompany an order granting relief pending final judgment; they are, therefore, interim in nature and may change after full trial on the merits. *See* NRS 37.100. If Eisenman ultimately proves that NL does not have a good faith intent to mine the property, it may be that the property would be subject to condemnation, since NL could not then be said to hold the reserves for a legitimate "mining" purpose.

court's interpretation of NRS 37.030(3), we would impose uncertainty and instability in an important Nevada industry. Such a result would thwart the clear intent of the legislature—to encourage the development of mining in this state. We will not construe statutes in a manner which will bring about an unreasonable result, or a result contrary to the legislature's purpose. Thomas v. State, 88 Nev. 382, 498 P.2d 1314 (1972); Cannon v. Taylor, 87 Nev. 285, 486 P.2d 493 (1971), modified, 88 Nev. 89, 493 P.2d 1313 (1972).

We need not reach the other issues raised by appellants.[6] The district court's decision is reversed and the order permitting immediate occupancy is vacated.

GUNDERSON, C. J., and SPRINGER and MOWBRAY, JJ., and ZENOFF, SR. J.,[7] concur.

---

[6]We recognize that appellants acknowledge the propriety of condemnation for ancillary mining purposes necessary to extract ore within the Claim boundaries, if Eisenman proves ownership rights to the Claim at trial, and if such ancillary use would not defeat NL's own current and anticipated mining uses.

[7]THE HONORABLE DAVID ZENOFF, Senior Justice, was assigned to participate in this case by the Chief Justice, pursuant to Nev. Const., art. 6, § 19.